IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 02-RB-2390 (CBS) (consolidated with 03-RB-2495 (CBS))

LISA SIMPSON,
      Plaintiff,
v.

UNIVERSITY OF COLORADO, Boulder, through its Board, the Regents of the University of
Colorado, a body corporate,
      Defendant.

---

Civil Action No. 03-RB-2495 (CBS)

ANNE GILMORE,
      Plaintiff,
v.

UNIVERSITY OF COLORADO, Boulder, through its Board, the Regents of the University of
Colorado, a body corporate,
      Defendant.

---

**MEMORANDUM ORDER REGARDING PLAINTIFFS'
JOINT MOTION FOR SANCTIONS FOR DEFENDANT'S CONCEALMENT
OF FOOTBALL RECRUITING SEXUAL HARASSMENT
and PLAINTIFFS' JOINT MOTION TO COMPEL**

---

Magistrate Judge Craig B. Shaffer

      THIS MATTER comes before the court on Plaintiffs Simpson and Gilmore's Joint

Motion for Sanctions for Defendant's Concealment of Football Recruiting Sexual Harassment

(Document # 545), filed under seal on March 11, 2005, and Plaintiffs' Joint Motion to Compel

(Document # 637), filed under seal on March 22, 2005. Defendant University of Colorado filed under seal a consolidated Response to the instant motions on April 20, 2005. At the same time, Defendant submitted for the court's *in camera* review selected documents maintained by the University's Office of Sexual Harassment (OSH), an unredacted Declaration of Christine Arguello, Esq., and a privilege log identifying particular documents from Office of Sexual Harassment files. Simpson and Gilmore filed under seal a Joint Reply to the University of Colorado's Response on April 25, 2005. On April 27, 2005, this court held a lengthy hearing on Plaintiffs' Joint Motion to Compel and Joint Motion for Sanctions, during which the court heard testimony from First Assistant Attorney General Brian Whitney, Esq. with the State of Colorado Office of Attorney General. In the wake of that hearing, Defendant filed a Motion to Supplement Record Regarding Plaintiffs' Joint Motion to Compel and Joint Motion for Sanctions (Document # 717), dated May 5, 2005, attached to which was an Offer of Proof expanding upon Mr. Whitney's hearing testimony. On May 13, 2005, the court received Plaintiffs' Joint Response in Opposition to Defendant University of Colorado's Motion to Supplement Record.

On June 6, 2005, at the request of the court, Defendant submitted additional materials for the court's *in camera* review. These documents consisted of unredacted versions OSH memoranda that previously had been submitted to the court in redacted form. The unredacted documents related to an investigation of a particular assistant football coach conducted by the

2

Office of Sexual Harassment in 2004.

By Order of Reference, this matter was referred to the Magistrate Judge to, *inter alia*, "hear and determine any pretrial matter, including discovery matters and non-dispositive motions." The court has carefully reviewed the pending motions and responsive briefs, the arguments of counsel during the April 27th hearing, the entire case file, and the applicable law, and finds that the issues presented do not require further oral argument.

## FACTUAL BACKGROUND

The court finds itself mired in yet another discovery dispute between the parties, albeit under rather unusual circumstances. Given the protracted history of this litigation, a vitriolic disagreement over the scope and obligations attendant upon discovery is not particularly remarkable. This court has addressed discovery disputes during informal telephone conferences with counsel, in the midst of ongoing depositions, during hearings on the record, and in prior written Orders. *See, e.g.,* Order on Discovery Motions, filed on February 10, 2004, and Order Granting, In Part, Plaintiffs' Motion to Compel Production of Disciplinary Records, filed on May 26, 2004. However, the relevant facts surrounding the pending dispute require some elaboration. The underlying nature of this Title IX litigation was summarized in the court's Memorandum Order Granting Plaintiffs' Motions to Amend Complaints, filed on May 26, 2004. I will presume some familiarity with the claims and defenses asserted by the parties and only highlight the procedural history necessary to place the pending motions in context. The court

held a Fed.R.Civ.P. 16 scheduling conference on April 15, 2003. At that time, the court set a

discovery deadline of November 21, 2003. With a Minute Order dated May 26, 2004, I extended

the discovery deadline to August 30, 2004.

Plaintiff Simpson argues that Defendant failed to produce documents which are

responsive to her Request for Production No. 4 and Request for Production No. 5, served on

June 12, 2003. Those requests, and Defendant's responses served on July 10, 2003, are quoted

verbatim herein:

> Request No. 4:   Produce all documents relating to any *investigation* of
> *sexual misconduct*, including but not limited to investigations of the University of
> Colorado Police Department, Boulder Police Department, Boulder Sheriff's
> Department, any other law enforcement agency, the University of Colorado
> Office of Judicial Affairs, the University of Colorado Athletic Department, and/or
> the University of Colorado football team, by any University of Colorado football
> player between 1993 and the present. (emphasis added)

> Response:   Objection. The term "sexual misconduct" is undefined and
> ambiguous. Without waiving its objection, the University states that other than
> the documents related to the investigation of Plaintiff's complaint, which are being
> produced, there are no documents responsive to this request.

> Request No. 5:   Produce all documents relating to any *investigation* of
> *misconduct*, including but not limited to investigations of the University of
> Colorado Police Department, Boulder Police Department, Boulder Sheriff's
> Department, any other law enforcement agency, the University of Colorado
> Office of Judicial Affairs, the University of Colorado Athletic Department, and/or
> the University of Colorado football team, by University of Colorado football
> players and/or recruits during any recruiting activity, whether formal or informal
> and including any social activity, from 1993 through the present. (emphasis
> added)

> Response:   Objection. The use of the term (sic.) is undefined, vague and

4

> ambiguous.  Assuming that by the use of the term "misconduct" Plaintiff means alleged criminal activity, the University responds as follows: documents responsive to this request include the Judicial Affairs files which are responsive to Request No. 2 as well as the University and police department's files related to Plaintiff's complaint.  The objection to Request No. 2 is incorporated here.  The other files are being, and/or have been, produced.

*See* Exhibits I and J attached to Plaintiffs' Joint Motion for Sanctions.  It is apparently undisputed that Defendant University did not supplement these particular responses after July 10, 2003.  *See* Transcript of Proceedings on April 27, 2005, at 84.

Plaintiff Gilmore served her written discovery on February 11, 2004, and Defendant responded on March 15, 2004.  Plaintiff Gilmore contends that the following requests for production are germane to the pending motions:

> Request No. 2:   Produce any and all documents, including correspondence, memoranda, reports, draft reports, Intelligence or "Intel" reports, complaints, whether formal or informal, search and/or arrest warrants, e-mails and documents of any description which contain any information concerning claims or allegations of *alcohol violations, sexual harassment, sexual abuse, sexual molestation and/or sexual assault or any other violence against women* involving CU football recruits for the period of January 1, 1997 to the present, regardless of whether the alleged victim/s wished any further action to be taken. (emphasis added)

> Request No. 3:   Produce any and all documents, including correspondence, memoranda, investigative records, reports, draft reports, Intelligence or "Intel" reports, complaints, whether formal or informal, search and/or arrest warrants, e-mails and documents of any description which contain any information and outcomes concerning claims or allegations of *alcohol and drug violations, sexual harassment, sexual abuse, sexual molestation, sexual assault and any other violence against women* involving CU football players or team members for the period of January 1, 1997 to the present, regardless of whether the alleged victim/s wished any further action to be taken. (emphasis

added)

*See* Exhibit K attached to Plaintiffs' Joint Motion for Sanctions.

With minor exceptions, Defendant provided the same response to each of these Requests:

The University specifically objects to producing documents covered by the attorney-client privilege and/or the work product doctrine including, without limitation, documents generated in the course of this litigation. The University further objects that this request seeks documents relating to allegations and to time periods not relevant to any claim or defense. The University also objects to the extent this request seeks University police documents that relate to any open criminal investigation, that are part of any multi-agency criminal investigation and/or that are maintained not as police records but as confidential discussions with victims and witnesses. For purposes of Rule 34, the University does not have possession, custody or control of such documents and their production would interfere with criminal law enforcement, be against the public interest and violate expectations of confidentiality. Subject to and without waiving these objections, the University will produce documents concerning allegations of sexual harassment and/or sexual assault involving University football recruits [or University student athletes] for the period January 1, 1997 to the present, if any.

*See* Exhibit L attached to Plaintiffs' Joint Motion for Sanctions.

The University's Response to Ms. Gilmore's Requests for Production also separately

addressed the issue of privileged documents and the requirement for a privilege log under

Fed.R.Civ.P. 26(b)(5).[1] On that issue, Defendant expressed its "understanding"

that the requests do not seek privileged documents written as part of and in the course of this litigation. So, for example, plaintiffs have not produced nor identified on a privilege log privileged documents reflecting an evaluation of the case, case strategies, communications with the client about the litigation, legal work product of attorneys and private investigators working on the case, legal research, draft pleadings and the like. The University agrees with plaintiffs' practice and the common understanding that such documents are not called for in discovery and should not be listed on a privilege log. The University has prepared

and previously produced a privilege log of documents that, subject to its objections, are requested and were not prepared as part of its defense in this case.[2]

*Id.*

On or about February 27, 2004, the Governor of Colorado issued an Executive Order designating the Attorney General for the State of Colorado to "investigate and prosecute criminal or civil matters relating to the University of Colorado and its football team and recruiting practices." *See* Exhibit 2 attached to Defendant's Response to Plaintiffs' Motion to Compel Production of University Police Documents, dated May 19, 2004. The Attorney General was empowered to appoint a task force to assist in his investigation, including "experts from law enforcement agencies and District Attorneys' offices from various judicial districts." *Id.* The Attorney General's task force included representatives from the University of Colorado Police Department. Members of the task force were selected by the second week of March 2004 and immediately began to take custody of relevant law enforcement records, including records maintained by the University of Colorado's Police Department. *See* Transcript of Proceedings on April 27, 2005, at 22 and 36-37. As the investigation unfolded, the task force confined its focus to criminal conduct and elected not to address "allegations of sexual harassment or . . . inappropriate sexual contact, [or] drunken fraternity parties." *Id.* at 79.

Also in February 2004, the University of Colorado's General Counsel hired Christine Arguello, Esq. to "provide legal advice to the University and to conduct an investigation,

including interviewing University employees and others, relating to issues raised by this litigation

and related public allegations." *See* Redacted Declaration of Christine Arguello, attached as

Exhibit 2 to Defendant's Response to Plaintiffs' Joint Motion.  On February 26, 2004, Ms.

Arguello interviewed a female student identified for purposes of this litigation as "Student-

Trainer B."  During that interview, Student-Trainer B disclosed information about an alleged

incident involving CU football players and recruits that occurred at the Omni Hotel on November

23, 2001.  Student-Trainer B also disclosed unrelated improper conduct by an assistant football

coach.  Although Student-Trainer B indicated that she did not "feel right" about her sexual

relations with a recruit and two football players at the Omni Hotel and had felt pressured, Ms.

Arguello concluded that Student-Trainer B had not been sexually assaulted or harassed.  After the

interview with Student-Trainer B, Ms. Arguello contacted the University's Office of Sexual

Harassment "to report the allegation concerning" the assistant football coach.

On March 2, 2004, Plaintiff Simpson's counsel wrote to University counsel expressing

Ms. Simpson's expectation that Defendant would be producing various categories of documents

in response to Plaintiff Gilmore's Rule 34 requests.  Those categories included "the documents of

the reported investigation by Christine Arguello."  *See* Exhibit D attached to Plaintiffs' Joint

Reply.  In the same letter, Simpson's counsel stated that he would expect "a proper privilege

log" to accompany the University's responses to Gilmore's requests "if you assert any

privileges regarding any of these documents."  *Id.*

On April 1, 2004, Ms. Gilmore's counsel inquired whether Defendant had "produced all documents responsive to our discovery requests and a privilege log concerning documents withheld?" *See* Exhibit F attached to Plaintiffs' Joint Reply. On April 2, 2004, defense counsel wrote to Plaintiff Gilmore's attorney, reiterating the position outlined in Defendant's responses to Gilmore's requests for production and confirming that the University had withheld responsive documents for reasons other than privilege. University counsel suggested that "we schedule a meeting so that you can fully understand the nature of our objections and what documents have not been produced." *See* Exhibit H attached to Plaintiffs' Joint Reply.

On April 5, 2004, Ms. Gilmore's attorney again stated that he was "very concerned to learn C.U. is withholding documents other than on the basis of attorney client and/or work product privilege." *See* Exhibit I to Plaintiffs' Joint Reply. In another letter dated April 23, 2004, Gilmore's counsel objected to Defendant's assertion of privilege and the sufficiency of the University's privilege log. Plaintiff's counsel warned that unless the challenged documents were produced by April 30, 2004, "we will file a motion to compel." *See* Exhibit K attached to Plaintiffs' Joint Reply.

On May 10, 2004, Plaintiffs Simpson and Gilmore filed a joint Motion to Compel Production of University Police Documents (Document # 231). That motion sought production of "all police documents in [the University's] possession relating to other allegations of sexual assaults, molestation or sexual harassment against University football players" since 1997. In

support of their position, Simpson and Gilmore argued that the Colorado Criminal Justice Records Act does not necessarily insulate law enforcement records from discovery under the Federal Rules of Civil Procedure.  Plaintiffs attached as an exhibit to their motion a single page from a University Police Department report which refers, without discussion, to an earlier alleged assault involving a unidentified female and one of the male participants in the incident at Ms. Simpson's apartment on December 7-8, 2001.  This female student subsequently has been identified for purposes of the pending motions as "C.C."  The single page from the police report does not indicate when this earlier assault may have occurred or describe any of the circumstances surrounding that alleged assault.  Notably, the May 10, 2004 Motion to Compel did not challenge Defendant's position on the scope of any privilege log or demand production of documents generated by the Arguello investigation.

In its Response to Plaintiffs' Motion to Compel Production of University Police Documents, dated May 19, 2004, Defendant conceded that "there are documents, including one Intel report and various documents provided to CUPD by other police agencies, not already produced to Plaintiffs, that relate to allegations of sexual assault involving University football players since 1997."  Defendant asserted that none of the subject documents nor any information contained in those documents had been disclosed to any University administrator, including members of the President's Office, Chancellor's Office, the Department of Athletics or the Football Program, prior to December 7, 2001.  The University argued that the motion should be

denied on the grounds that the requested documents were not relevant to any claim asserted by Plaintiffs Simpson and Gilmore, and were not within the possession, custody or control of the University for purposes of Rule 34 of the Federal Rules of Civil Procedure.

During a hearing on May 21, 2004, the court noted that the University was taking the position that "whatever responsive documents they had are no longer in their possession and they're now in the custody of the attorney general's office. The attorney general's office has specifically said 'we're not going to release them to you.'" *See* Transcript of Proceedings on May, 21, 2004, at p. 65. The following colloquy ensued between the court and Ms. Gilmore's counsel:

> MR. BARNHART:   The question that is not answered is when they – when [responsive documents] were requested by the task force and when they were sent to the task force.
>
> THE COURT:   And that may require you to do some further discovery. But you have asked me in this motion to produce documents that they say they don't have.
>
> *   *   *
>
> MR. BARNHART:   And I am posing the questions to University counsel: when –
>
> THE COURT:   Counsel, you seem to confuse discovery with the hearing in front of me. If you want to conduct discovery to try to establish bad faith, do it. But I'm not going to sit here and allow you to conduct a quasi deposition in my courtroom . . . . Notice up a deposition, explore it. If you think you can demonstrate that somehow they have subverted the purpose of Rule 34 or somehow subverted their obligations under Rule 34, I'm happy to have you discuss it.

11

\* \* \*

>    THE COURT:   . . . Now, if it should develop that they have misrepresented the factual record or if they have somehow subverted intentionally and in bad faith their obligations under Rule 34, I'm happy to hear you out. But you are going to have to develop a factual record in order to make that argument, and you're not going to make the factual record through discovery conducted in my courtroom here today.

*Id.* at pp. 67-69.  Based upon the foregoing comments, the court denied without prejudice

Plaintiffs' Motion to Compel Production of University Police Documents.

Mr. Whitney wrote to counsel for Plaintiffs and the University on June 18, 2004.  In his

letter, Mr. Whitney acknowledged that the task force

>    has no interest in or opinion about the merits of the civil litigation.  We have been tasked with the investigation of potential criminal matters surrounding recruiting practices and the football program at the University, and those matters are our only concern and obligation.  As such, the release or retention of records involved in our investigation takes no position as to who can be given information and who cannot. . . . The Attorney General believes that to ensure unbiased and thorough investigation of the matter assigned to the Task Force, the investigation and its fruits would remain in the custody of the Attorney General until completion of the investigation and, at that time, may be revealed to outside interests, whomever they may be.  As such, he has ordered that release of any information not within the Grand Jury, but related to the Task Force investigation remain in the custody of the Attorney General subject to the provisions of Colorado's Open Records Act and not released.

*See* Exhibit 17 attached to Defendant's Response to Plaintiffs' Joint Motions.

On July 23, 2004, University counsel addressed Gilmore Request Nos. 2 and 3 in a letter

to Ms. Gilmore's attorney.  Defense counsel indicated that "[w]ith respect to RFP #2, there are

no documents in our custody and control which have not been produced."  As for Request No. 3,

counsel represented that "all documents in our custody and control regarding sexual harassment and/or sexual assault have been produced.  To the extent that your request seeks all documents regarding allegations of alcohol violations, it seeks irrelevant information, is overly burdensome, and would invade the privacy and FERPA rights of our students." *See* Exhibit N attached to Plaintiffs' Joint Reply.

The parties continued to take depositions throughout much of 2004.  For example, on June 5, 2004, Plaintiffs deposed University President Elizabeth Hoffman.  During that deposition, President Hoffman was asked whether there may have been other incidents of sexual harassment involving female students at the University.  In response, the deponent indicated "[t]here have been discussions in the context of the – the lawsuit about whether some other incidents might have been part of this, but otherwise, no." *See* Deposition of Elizabeth Hoffman, at 363, attached as Exhibit F to Plaintiffs' Joint Motion for Sanctions.  After the deponent consulted with defense counsel, the following colloquy took place:

> [PRESIDENT HOFFMAN]:    The reason I hesitated and thought about it is, I was considering the issue of [the assistant football coach], who is being investigated for sexual harassment, but not sexual assault.[3]
>
> Q.    Okay.  And is it your understanding and I want to make sure I'm clear about this, is it your understanding that there may be other women in and other incidents, but they are part of an ongoing investigation?
>
> A.    No.  The only one I was thinking about was [the assistant football coach], and this being investigated as a sexual harassment.  So, I was thinking about whether that would counter it.

13

*Id.* at 364-65. President Hoffman indicated that she was aware that Student-Trainer B had
spoken to "a member of our investigating team." *Id.* at 367.

On July 12, 2004, Plaintiffs deposed Stephen Willard, the Head Trainer and Director of
Sports Medicine at the University. During that deposition, Mr. Willard indicated that he had
knowledge of a sexual relationship between a CU assistant football coach and Student-Trainer B.
Willard testified that he was aware of this alleged sexual relationship through discussions "with
the sexual harassment personnel on campus," and indicated those discussions had occurred earlier
in 2004 and after December 7, 2001. *See* Deposition of Stephen Willard, at 53, attached as
Exhibit E to Plaintiffs' Joint Motion for Sanctions. Apparently, Willard spoke with Student-
Trainer B in February 2004, and then reported the incident involving the assistant football coach
to the Office of Sexual Harassment. *Id.* at 55.

On October 29, 2004, Simpson's counsel wrote to opposing counsel concerning
supplementation of discovery responses. According to Simpson's counsel, "one continuing area
of concern is CU's incomplete responses regarding other victims of sexual assault by football
players or staff." In his letter, counsel writes that "[w]e have good reason to believe there are a
number of additional reports of sexual harassment and assault by CU athletes of female students,
. . . . All of this information is plainly relevant to "notice" received by CU as well as deliberate
indifference, key issues in this case." *See* Exhibit 12 attached to Defendant's Response to Joint
Motions.

Defense counsel addressed the issue of Gilmore's document requests in another letter dated November 23, 2004. Referring to Gilmore Requests Nos. 2-5, defense counsel noted that the "University responded to these requests months ago, including appropriate objections based on relevance, custody and control and other bases." *See* Exhibit 13 attached to Defendant's Response. Defense counsel again acknowledged that "there are police records on multiple incidents that we have not produced" based upon the Attorney General's position that the University should not produce documents relating to the task force's ongoing investigation. *Id.*

On December 7, 2004, University counsel wrote to Ms. Simpson's and Ms. Gilmore's attorneys. In that letter, University counsel indicated that he had

> turned over two documents to the CU Police Department for return to the Attorney General. These documents include a copy of the interview conducted by Tim Delaria as part of the Attorney General's investigation which he in turn provided to the University's Sexual Harassment Office in connection with an investigation into allegations of harassment by [an assistant football coach]. The second document is a report regarding an allegation of sexual assault by a football player. I am providing you with this information because as you know we have previously advised you, as well as the Court, that we had certain documents as to which the Attorney General had asserted custody and control. We no longer have these documents.

*See* Exhibit 14 attached to Defendant's Response to Plaintiffs' Joint Motions.

Plaintiffs maintain that they learned for the first time in February 2005 that Student-Trainer B was claiming to have been sexually harassed by CU football players and recruits at the Omni Hotel during the evening of November 23, 2001, approximately two weeks before the incident at Ms. Simpson's apartment. *See* Plaintiffs' Joint Motion for Sanctions, at 3. Plaintiffs

further contend that "Ms. Arguello communicated with both CU litigation counsel in this case and with CU's University Counsel office." From these facts, Plaintiffs presume that "many CU offices were aware of the February-March 2004 [Office of Sexual Harassment] report and ensuing investigation, including [Head Trainer] Willard, Athletic Director Tharp, Associate Athletic Director Winkelbauer, Coach Barnett, Director of Football Operations Hansburg, and President Hoffman, as well as Ms. Arguello and other CU counsel." *Id.* at 6.

Defendant University moved for summary judgment on May 5, 2004. Briefing on that motion was completed by July 14, 2004. Plaintiffs filed the pending Joint Motion for Sanctions on March 11, 2005, and simultaneously filed under seal a Supplemental Response and Brief in Opposition to the University of Colorado's Motion for Summary Judgment. The Supplemental Response cited "new evidence of CU's actual knowledge of harassment and deliberate indifference to the known harassment of its students," and incorporated under seal an affidavit by Student-Trainer B which described the November 23, 2001 incident at the Omni Hotel. Notably, Plaintiffs' Supplemental Response did not seek relief under Fed.R.Civ.P. 56(f)[4] or affirmatively ask the District Court to defer action on the pending motion for summary judgment. As of March 11, 2005, Plaintiffs had not moved to compel additional discovery. To the contrary, Plaintiffs took the position that the new information provided by Student-Trainer B "proves that CU had actual knowledge of prior harassment by some of the very same individuals who harassed Plaintiffs in remarkably similar circumstances." *See* Plaintiffs' Supplement Response

and Brief in Opposition, at 3.

On March 22, 2005, Plaintiffs filed their Joint Motion to Compel.  Once again, Plaintiffs

omitted any reference to Fed.R.Civ.P. 56(f).  On March 31, 2006, the District Court entered an

Order Granting Defendant's Motion for Summary Judgment.  In that Order, the District Court

held that

> the relevant risk in this [Title IX] case is the particular risk cited by the plaintiffs:
> the risk that football players and recruits would sexually assault female University
> students as part of the recruiting program, including the risk that those assaults
> would be aided or exacerbated by excessive alcohol use by players, recruits and
> female students.  In the context of the record in this case, a risk defined more
> broadly would fall outside of the narrowly circumscribed purview of liability
> under Title IX.

*See* Order Granting Defendant's Motion for Summary Judgment, at 12.  After reviewing the

record at some length, the District Court found some evidence indicating that relevant University

officials were aware of a sexual assault in 1997, of harassment directed toward Katherine Hnida in

2000, and of an assault in October 2001 involving a different female student trainer and a football

player.  However, the District Court found that "all of the relevant information known to CU

officials did not constitute adequate notice, under Title IX, that female CU students, including the

plaintiffs, faced a risk that CU football players and recruits would sexually assault female

University students as part of the recruiting program."  *Id.* at 22.

On April 14, 2005, Plaintiffs filed under seal a Motion to Alter or Amend Judgment or

For Relief from Judgment, pursuant to Fed.R.Civ.P. 59(b) and 60(b).[5]  This motion contends, in

pertinent part, that "new evidence of sexual harassment and sexual assault in CU's football program and recruiting activities justifies reconsideration of summary judgment." *But see* Fed.R.Civ.P. 60(b)(2) (permitting the court to relieve a party from a final judgment based upon "newly discovered evidence which by due diligence could not have been discovered in time to move for new trial under Rule 59(b)). *See also New Hampshire Ins. Co. v. Martech USA, Inc.*, 993 F.2d 1195, 1201 (5th Cir. 1993) (relief under Rule 60(b)(2) requires the moving party to demonstrate that it exercised due diligence in obtaining information, that the new evidence is material and controlling, and that the new evidence clearly would have produced a different result if presented before the original judgment). Plaintiffs' "new evidence" is also the subject to the pending Joint Motion to Compel and Joint Motion for Sanctions.

## ANALYSIS

Plaintiffs have moved, pursuant to Fed.R.Civ.P. 37(a), to compel production "of documents regarding any incidents of sexual harassment or assault involving anyone associated with the CU football program from 1997 through the present, including" incidents involving Student-Trainer B, student C.C., and a University football player identified herein as "R.E." More specifically, Plaintiffs seek production of the following categories of documents: (1) documents relating to Student-Trainer B, including notes, memoranda or tape recordings prepared in connection with the Arguello investigation, as well as victim assistance records and records maintained by the University's Department of Sports Medicine and Office of Sexual

Harassment;  (2) documents relating to student C.C.; (3) documents relating to E.R.; and (4) documents relating to other incidents of sexual harassment or assault by anyone affiliated with the CU football program, including incidents involving a particular assistant football coach. Plaintiffs further ask the court to order production of "detailed privilege logs . . . for all documents for which privilege is asserted, submission of such documents for *in camera* review for privilege by the court," and an award of expenses incurred in connection with this Joint Motion to Compel.

The instant Joint Motion for Sanctions broadly alleges that "CU officials and counsel have perpetrated an elaborate subterfuge to conceal facts so critical and damaging they may determine the outcome of this case." Plaintiffs contend that University employees and witnesses concealed their knowledge of other incidents of sexual harassment involving individuals who participated in the December 7-8, 2001 incident involving Simpson and/or Gilmore.  At the time they filed their Joint Motion for Sanctions, Plaintiffs sought:  (1) under Fed.R.Civ.P. 37(b)(2)(A), "an order that the element of Title IX liability of 'actual knowledge' be taken as established; (2) under Fed.R.Civ.P. 37(b)(2)(A), an order prohibiting CU from introducing any evidence or cross-examination that rebuts or impeaches Student-Trainer B's testimony; (3) under Rule 37(b)(2)(C), an order striking Defendant's dispositive motions and motions *in limine*; (4) an order that the jury shall be informed of Defendant's concealment; and (5) an order awarding fees and costs.  Since that relief was requested, the District Court has entered summary judgment in

favor of Defendant University.

I.      *Plaintiffs' Joint Motion to Compel*

Rule 37(a)(2) of the Federal Rules of Civil Procedure provides that a party may apply for

an order compelling disclosure or discovery if a party fails to answer an interrogatory submitted

under Fed.R.Civ.P. 33, or if a party fails to permit inspection of documents or other materials in

response to a request under Fed.R.Civ.P. 34.  Rule 37(a)(3) further mandates that an evasive or

incomplete disclosure, answer or response shall be treated as a failure to disclose, answer or

respond.  *See* Fed.R.Civ.P. 37(a)(3).  A motion to compel under Rule 37(a)(2), however,

necessarily implicates the issue of relevance under Fed.R.Civ.P. 26(b)(1).  *Cf. Alexander v. F.B.I.*,

186 F.R.D. 78, 97 (D.D.C. 1998) ("a motion to compel for failure to provide relevant

information sought through discovery requires the court to determine if the materials or

testimony sought are relevant to the action").  Plaintiffs' Joint Motion to Compel must be denied

to the extent it seeks information that is not properly discoverable.

Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the

interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of

information.  *United States ex rel. Schwartz v. TRW, Inc.*, 2002 WL 31688812 (C.D. Cal. 2002).

To that end, Rule 26(b) permits discovery "regarding any matter . . . that is relevant to the claim

or defense of any party" or discovery of any information that "appears reasonably calculated to

lead to the discovery of admissible evidence." *See* Fed.R.Civ.P. 26(b)(1). *See also Williams v. Board of County Commissioners*, 192 F.R.D. 698, 702 (D. Kan. 2000) (request for discovery should be considered relevant if there is any possibility the information sought may be relevant to a claim or defense). The Advisory Committee Notes to Rule 26 acknowledge that discoverable information may include "other incidents of the same type" or "information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses." *See* Advisory Committee Notes to the 2000 Amendments to Rule 26. However, the Advisory Committee Notes also concede that

> the "reasonably calculated to lead to the discovery of admissible evidence" standard . . . might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that *information must be relevant to be discoverable, even though inadmissible,* and that discovery of such material is permitted if reasonably likely to lead to the discovery of admissible evidence.

*Id.* (emphasis added).

"When the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the scope of relevance as defined under Fed.R.Civ.P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Horizon Holding, L.L.C. v. Genmar Holdings, Inc.*, 209 F.R.D. 208, 211 (D. Kan. 2002) (citing *Sheldon v. Vermonty*, 204 F.R.D. 679, 690 (D. Kan. 2001)). An objecting party cannot sustain this burden with boilerplate claims that the requested

discovery is oppressive, burdensome or harassing. *See St. Paul Reinsurance Company, Ltd. v.*

*Commercial Financial Corp.*, 198 F.R.D. 508, 513 (N.D. Iowa 2000).

    A.    <u>Documents Relating to Conduct Involving An Assistant Football Coach</u>

As noted previously, the District Court has held that for purposes of Title IX, Defendant

cannot be deliberately indifferent to a risk of sexual harassment or sexual assault if the University

did not have adequate notice of the risk. *See* Order Granting Defendant's Motion for Summary

Judgment, at 9. The District Court also concluded that Plaintiffs' Amended Complaints describe

a very specific risk for purposes of their Title IX claims; *i.e.*, the risk that football players and

recruits would sexually assault female University students as part of the recruiting program,

including the risk that those assaults would be aided or exacerbated by excessive alcohol use by

players, recruits and female students. *Id.* at 12. These rulings must shape this court's decision

on the pending motion to compel. *See United States v. Platero*, 72 F.3d 806, 810 (10th Cir. 1995)

("the law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to

reopen what has been decided'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S.

800, 817 (1988)).

In their Joint Motion to Compel, Plaintiffs seek production of documents relating to

incidents of sexual harassment or assault involving female students and a particular assistant

football coach. As a threshold matter, material concerning sexual harassment by a CU assistant

football coach is not responsive to the particular discovery requests propounded by Plaintiff

Simpson. Her Request Nos. 4 and 5 sought all "documents relating to any investigation of sexual misconduct . . . *by any University of Colorado football player* between 1993 and the present" and "documents relating to any investigation of misconduct . . . *by University of Colorado football players and/or recruits* during any recruiting activity, whether formal or informal and including any social activity, from 1993 through the present."[6]  Similarly, Plaintiff Gilmore's Request No. 2 was limited to documents relating to "claims or allegations of alcohol violations, sexual harassment, sexual abuse, sexual molestation and/or sexual assault or any other violence against women involving *CU football recruits*."  Ms. Gilmore's Request No. 3, however, more broadly addresses "claims or allegations of alcohol and drug violations, sexual harassment, sexual abuse, sexual molestation, sexual assault and any other violence against women involving *CU football players or team members*."  For purposes of the pending motion, the court will broadly construe the phrase "team member" to include assistant coaches and graduate assistants.

Defendant has provided responsive documents for the court's *in camera* review.  Based upon that review, I find documents concerning the assistant football coach in question are not relevant to the claims or defenses in this case and not properly discoverable under Rule 26(b)(1). The incidents allegedly involving this assistant football coach did not include football players or recruits, and did not relate in any way to football recruiting activities.  Under the circumstances, these incidents "fall outside of the narrowly circumscribed purview of liability under Title IX" as delineated by the District Court's Order granting Defendant's Motion for Summary Judgment.

Just as importantly, while some of the alleged conduct involving the assistant football coach appears to have occurred in late 2001, there is no evidence to suggest that University authorities with the requisite control were aware of the assistant coach's conduct prior to February 2004. *See Murrell v. School District No. 1, Denver, Colorado*, 186 F.3d 1238, 1247 (10th Cir. 1999) (to establish Title IX liability, plaintiff must show "that a school official who possessed the requisite control over the situation had acknowledge knowledge of, and was deliberately indifferent to, the alleged harassment"). Without some showing of relevance in the wake of the District Court's Order of March 31, 2005, Plaintiffs' Joint Motion to Compel must be denied as to records relating to alleged sexual harassment or misconduct by an assistant football coach. *See Horizon Holding, L.L.C. v. Genmar Holdings, Inc.*, 209 F.R.D. at 211 (noting that where the relevance of requested discovery is not apparent, the proponent of that discovery has the burden to show relevance).

> **B.**     Documents Relating to Conduct by Football Player E.R.

The requirement of relevance also dooms Plaintiffs' attempt to compel production of documents relating to alleged sexual harassment involving football player E.R. Based upon the court's *in camera* review of OSH documents tendered by Defendant, I conclude that any allegations involving E.R. are irrelevant to the Title IX claims asserted by Plaintiffs Simpson and Gilmore in this action. The conduct in question occurred long after the incident on December 7-8, 2001, and was wholly unrelated to recruiting activities by the University's football team. Even

under the most liberal interpretation of Rule 26(b)(1), the conduct by football player E.R. falls

outside the boundaries of proper discovery in this action.  Plaintiffs' Joint Motion to Compel is

denied with respect to that material.

       C.      Documents Relating to Student C.C.

Plaintiffs' Joint Motion to Compel states that C.C. is a female student and a former

"ambassador" with the CU football team.  Plaintiffs contend that C.C. was assaulted in October

2001 by a CU football player who was also involved in the incident in Ms. Simpson's apartment

on December 7-8, 2001, as well as the incident involving Student-Trainer B on November 23,

2001.  *See* Plaintiffs' Joint Motion to Compel, at 3-4.  Plaintiffs concede that a single reference to

the C.C. assault appeared in a University Police Department document produced in discovery as

early as May 2003.  However, Plaintiffs also suggest that their efforts to obtain additional

information about this alleged assault were frustrated by assertions of privilege during the

depositions of CU Detective Delaria and CU President Hoffman.  Simpson and Gilmore insist

that they obtained critical information concerning the C.C. assault for the first time during the

March 11, 2005 deposition of C.C.'s former roommate.  Plaintiffs are moving to compel

production of documents regarding the October 2001 assault on C.C., including police reports,

Office of Sexual Harassment records, and documents prepared in connection with the Arguello

investigation.[7]

       Defendant University wishes to place the demand for C.C. documents in a fuller context.

Defendant points out that Plaintiff Simpson included C.C. in her Third Supplement Rule 26(a)(1) Disclosures, served on March 2, 2004. Plaintiffs utilized the previously disclosed police report excerpt referencing C.C. during the April 7, 2004 deposition of David Hansburg. At that time, Plaintiffs' counsel were told that additional police records concerning C.C. would not be produced during discovery. Plaintiffs moved to compel production of police documents relating to C.C. on May 6, 2004. This court denied that motion without prejudice on May 21, 2004. Plaintiffs also referenced the alleged assault on C.C. in their Responses to Defendant's Motion for Summary Judgment.

In light of the foregoing record, I will deny the pending motion to compel production of documents pertaining to C.C., as both futile and untimely. As to futility, Defendant has represented to the court that records pertaining to C.C. do not exist within the Office of Sexual Harassment or the Office of Judicial Affairs. *See Bank of New York v. Meridien BIAO Bank of Tanzania Ltd.*, 171 F.R.D. 135, 152 (S.D.N.Y. 1997) ('[u]nder ordinary circumstances, a party's good faith averment that the items sought simply do not exist . . . should resolve the issue of failure of production"); *Clark v. Willamette Industries, Inc.*, 918 F. Supp. 139, 143 (W.D. Pa. 1996) ("it is of little use for [the] Court to order the production of documents which do not exist").

As for University police records relating to an October 2001 incident involving C.C. and a football player who was also present during the incident with Ms. Simpson on December 7-8,

2001, I conclude that such documents would be discoverable under Rule 26(b)(1).  At this juncture, I do not have sufficient information to draw any conclusions as to the facts surrounding the alleged incident.  However, as noted, Rule 26(b)(1) permits discovery of "other incidents of the same type" alleged by Plaintiffs and allows discovery of information that might be used to impeach a likely witness at trial.  Police documents pertaining to C.C. would seem to fall within these discovery parameters.

Defendant takes the position, however, that any University police records relating to C.C. are not within its possession, custody or control and, therefore, are not subject to discovery under Fed.R.Civ.P. 34.  For purposes of Rule 34, documents are deemed to be in a party's possession, custody or control if that party has actual possession, custody or control of the materials *"or* has the legal right to obtain the documents on demand." *Klesch & Co., Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 520 (D. Colo. 2003 (quoting *Resolution Trust Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 110 (D. Colo. 1992).  *See also Golden Trade v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992) (Rule 34 is "customarily interpreted as requiring that the party have the 'legal right to obtain the documents requested on demand'").  Some courts have construed "control" more broadly to include the "practical ability to obtain the materials sought upon demand." *See, e.g., Securities and Exchange Commission v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000); *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000).  *But see Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir.

1993) ("the fact that a party could obtain a document if it tried hard enough and maybe if it didn't try hard at all does not mean that the document is in its possession, custody or control; in fact it means the opposite").  However, even under the most expansive interpretation of "control," the "practical ability" to demand production must be accompanied by a similar ability to enforce compliance with that demand.

It now appears that the University's response to Plaintiff Simpson's Request No. 4 was incorrect to the extent Defendant represented that no responsive documents existed "other than the documents related to the investigation of Plaintiff's complaint, which are being produced." On June 12, 2003, Simpson asked for "all documents relating to any investigation of sexual misconduct . . . by any University of Colorado football player between 1993 and the present." In responding to this discovery request, the University affirmatively stated that there were no responsive documents save for records relating to the investigation of Ms. Simpson's allegations. Defendant had an affirmative duty to supplement its Rule 34 responses once it learned "that the response [was] in some material respect incomplete or incorrect."  *See* Fed.R.Civ.P. 26(e)(2). While Plaintiff Simpson accuses the University of bad faith in failing to produce C.C. records prior to May 2004, her counsel readily conceded that

> [just] as C.U. counsel, as you've heard this morning, didn't – were not aware of the contents of that – Detective Delaria's report that makes the reference to C.C., neither were we.  It had escaped the attention of both sides.  And until Gilmore counsel entered the case and they can say when they learned it, but it was not until 2004.

*See* Transcript of Proceedings on April 27, 2005, at 152-53.  While a party may not meet its discovery obligations "by sticking its head in the sand and refusing to look for the answers," *In re Independent Service Organizations Antitrust Litigation*, 168 F.R.D. 651, 653 (D. Kan. 1996), Rule 26(g) contemplates an objectively "reasonable inquiry" before responding to Rule 34 requests.  *See* Fed.R.Civ.P. 26(g)(2).  There is no evidence in the record to suggest that Defendant's failure to disclose all police records relating to C.C. in 2003 was deliberate or intentionally evasive.  To the contrary, it appears that both Simpson's counsel and Defendant's counsel were guilty of inadvertently overlooking this isolated reference.

The chronology of events becomes more complicated after February 11, 2004, with service of Plaintiff Gilmore's discovery requests, which asked for "any and all documents . . . which contain any information concerning claims or allegations of . . . sexual harassment, sexual abuse, sexual molestation and/or sexual assault or any other violence against women involving CU football players or team members for the period of January 1, 1997 to the present."  It appears that Ms. Gilmore's counsel was aware of the police report excerpt alluding to an alleged incident involving C.C. and a football player, and took the position that his client's outstanding document requests encompassed documents concerning C.C.  Pursuant to Rule 34, Defendant would have been required to produce responsive documents, including the C.C. documents, on or before March 15, 2004.[8]  However, Plaintiffs were on notice, as early as March 15, 2004, that Defendant was objecting to the production of "police documents that relate to any open criminal

investigation, [or] that are part of any multi-agency criminal investigation." Defendant took the

position that "for purposes of Rule 34, the University does not have possession, custody or

control of such documents."[9]

Moreover, as a result of Defendant's Response to Plaintiff's Motion to Compel

Production of University Police Documents, served on May 19, 2004, Plaintiffs were aware of

Mr. Whitney's May 18, 2004 letter, which states:

> Pursuant to the Attorney General's mandate to the task force, all documents and
> information involving allegations of sexual assault against CU football players
> (past or present) in the possession of the CU police department that have not
> been previously publicly distributed, are not in the custody of the task force
> investigating CU and, as such, these documents are no longer in CU's custody or
> control . . . The Attorney General, in his discretion as official custodian pursuant
> to C.R.S. § 24-72-304, has directed that none of these documents be released to
> any person or entity outside of those law enforcement persons participating on
> the Task Force at this time.  This includes litigants in the civil proceedings.

See Attachment 3 to University's Response to Plaintiffs' Motion to Compel Production of

University Police Documents.

The Colorado Criminal Justice Records Act provides that the official custodian of

criminal justice records has the discretion to permit inspection by any person "except as

otherwise provided by law."  See Colo. Rev. Stat. § 24-72-304(1).  The Act further provides that

the custodian of criminal justice records may deny access to "records of investigations conducted

by . . . any sheriff, district attorney, or police department or any criminal justice investigatory

files compiled for any other law enforcement purpose," on grounds that disclosure would be

contrary to the public interest, "unless [inspection is] otherwise provided by law." *See* Colo. Rev. Stat. § 24-72-304(5).  The Colorado Supreme Court has acknowledged that the Open Records Act, of which the Criminal Justice Records Act is a part, was not intended to supplant discovery practice in civil litigation. *Martinelli v. District Court*, 612 P.2d 1083, 1093 (Colo. 1980) (noting that "[t]he open records laws are 'directed toward regulation of the entirely different situation of the general exploration of public records by any citizen during general business hours'").  Colorado's Criminal Justice Records Act also specifically provides a mechanism for challenging an official custodian's refusal to provide public access to criminal justice records. *See* Colo. Rev. Stat. § 42-72-305(7).  Plaintiffs' May 10, 2004 motion to compel police documents discussed the Criminal Justice Records Act at length and acknowledged the public's right to challenge the official custodian's decision to preclude access.  However, it is also undisputed that Plaintiffs never sought relief under § 24-72-305(7) after May 21, 2004.[10] Plaintiffs also made no attempt to renew their motion to compel prior to the close of discovery in August 2004, notwithstanding the court's invitation during the hearing on May 21, 2004.

In light of those omissions, the court notes the following exchange between Plaintiff Simpson's counsel and Mr. Whitney during the hearing on April 27, 2005:

> Q.    And so you told me that you would not provide those reports to me?
>
> A.    That's correct.
>
> Q.    Did you tell me what – that I could make a – an Open Records

request but what the likely result of that would be?

A.   I believe I told you that if there was an Open Records request, I, as the agent of the attorney general, would fight that request.  And whether it was successful or not, I have no idea of the outcome.

*   *   *

Q.   Did you ever take the position with C.U. counsel that the attorney general would not permit the University to comply with a federal discovery order with respect to its copies of these reports?

A.   I don't believe – I simply took a position based upon my role as custodian.  I don't believe even I would disobey an order of a court not to produce the records if ordered to.  So I don't believe I made that assertion.

Q.   Hypothetically, if there were a federal order to C.U. to produce police reports created by its employees and the C.U. Police Department regarding C.C. and B, what would your position be?

A.   If there was an order requesting they turn them over, I would probably initially request the Court to view them in camera.  And if that was denied, I would follow the order.

*See* Transcript of Proceedings on April 27, 2004, at 27 and 31.

The Federal Rules of Civil Procedures provide remedies for discovery violations or abusive discovery tactics.  While recent amendments to the Federal Rules have expanded the court's role in managing discovery and resolving discovery disputes, *see, e.g.,* Fed.R.Civ.P. 26(b)(2) (permitting the court to "act upon its own initiative" to regulate the frequency or extent of use of discovery methods), litigants must still be pro-active in exercising the discovery remedies afforded by the Federal Rules.  The parties are expected to diligently comply with the

"meet and confer" requirement imposed by Rule 37(a)(2)(B). But at some point, further attempts to informally resolve discovery disputes become patently futile. Thereafter, the aggrieved party must seek judicial intervention in a timely manner. *See Continental Industries, Inc. v. Integrated Logistics Solutions, LLC*, 211 F.R.D. 442, 444 (N.D. Okl. 2002) (after acknowledging it is "especially important that a party file its motion [to compel] before the discovery cutoff," held that a failure to pursue discovery remedies in a timely manner may result in a waiver of discovery violations); *Butler v. Benson*, 193 F.R.D. 664, 666 (D. Colo. 2000) (held that a party cannot ignore available discovery remedies and then move to compel on the eve of trial). Under the particular facts in this case, I conclude that Plaintiffs' Joint Motion to Compel production of police records pertaining to C.C. must be denied as untimely.

Plaintiffs also have moved to compel documents relating to C.C. prepared in connection with the Arguello investigation. Simpson and Gilmore maintain, at the very least, that they are entitled to a privilege log which identifies all investigation documents that have been withheld on the basis of privilege, including a February 2004 Arguello interview and memorandum. Simpson and Gilmore contend that Defendant has failed to fully comply with its obligations under Fed.R.Civ.P. 26(b)(5), which require a party to identify in writing otherwise discoverable information that has been withheld on the basis of privilege or the work product doctrine. Plaintiffs maintain that the University repeatedly failed to properly respond to their requests for such a privilege log. *See* Plaintiffs' Joint Reply, at 6-11. Plaintiffs insist that Defendant's failure

to produce a privilege log "may be deemed a waiver of the privilege," citing *Atteberry v.*

*Longmont United Hospital*, 221, F.R.D. 664, 648 (D. Colo. 2004).

Defendant takes the position that on March 15, 2004, it "expressly communicated to

plaintiffs its understanding that work product materials of attorneys and private investigators

prepared 'in the course of this litigation' were not 'called for in discovery and should not be

listed on a privilege log.'" *See* Defendant's Response, at 26.   Notably, Defendant cites no legal

precedent to support or justify that "understanding."   To the contrary, a similar argument was

rejected in *Horton v. United States*, 204 F.R.D. 670 (D. Colo. 2002).   In that case, the defendant

sought production of a privilege log listing documentation that had been withheld by a third-

party.   In response, the non-party unsuccessfully argued that "documents exchanged between a

client and its lawyers subsequent to the initiation of the litigation and concerning the litigation

need not be included in the privilege log."  *Id.* at 673.   Magistrate Judge Boland's analysis in

*Horton* is equally applicable to this case.

> . . . the plain language of Rule 26(b)(5) extends to all documents withheld from
> production on a claim of privilege.   In addition, the cases imposing the requirement
> of a privilege log do not carve out of the requirement documents between a lawyer
> and client created after the initiation of the litigation.   Moreover, common sense
> dictates that even post-filing correspondence and materials exchanged between
> lawyer and client must be listed on the privilege log.   It is certainly possible that
> such a document might be copied to a third party, thus destroying any privilege
> that otherwise would attach.

*Id.* at 673 (internal citation omitted).   The need to include post-filing documents on a privilege log

is also supported by Rule 26(b)(3), which recognizes that "fact work product" may be

discoverable upon a showing "that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *See* Fed.R.Civ.P. 26(b)(3).[11] Without a comprehensive privilege log, the party seeking discovery would be hard-pressed to even know that such "fact work product" existed. *Cf. FG Hemisphere Associates, L.L.C. v. Republique du Congo*, 2005 WL 545218, *7 (S.D.N.Y. 2005) (holding that defendant's argument that it need not include post-filing documents on a privilege log was "not supported by law or logic"). Notably, Plaintiffs failed to cite these legal precedents in their Joint Motion to Compel.

Defendant suggests that it was not required to include post-filing materials on its privilege log because, in part, "plaintiffs have never requested a log for such investigative documents and have never themselves provided a privilege log for their lawyers' or investigators' documents." *See* Defendant's Response, at 26. The drafters of Rule 26 seemly rejected this "two wrongs make a right" argument.[12] For example, Rule 26(a)(1)(E) specifically states that a party is not excluded from making the required initial disclosures "because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures." *See* Fed.R.Civ.P. 26(a)(1)(E).

Defendant's position is no more persuasive if re-cast as an attempt to reduce the administrative burdens of litigation. The Advisory Committee Notes to Rule 26(b)(5) suggest

that where voluminous documents are claimed to be privileged or protected, it may suffice for the responding party to describe those documents by categories. *See* Advisory Committee Notes to the 1993 Amendments to Rule 26. For example, in document-intensive cases, a party might identify "post-filing correspondence between Lead Counsel, Esq. and client" as a single category. That description might be sufficient for the court and opposing counsel to confirm the proper application of the attorney-client privilege. However, it does not seem unduly burdensome to require a party to list on a privilege log entries such as "attorney interview with female student-trainer" or "meeting with Office of Sexual Harassment." Neither entry would compromise a party's right to assert an appropriate privilege, but certainly would place the requesting party on notice that potentially discoverable fact work product had been withheld. At the very least, Rule 26(b)(3) contemplates that minimal degree of disclosure. *Cf. In re Papst Licensing*, 2001 WL 1135268, *2 (E.D. La. 2001) (while suggesting that comprehensive privilege log entries may not be necessary for post-filing documents, required the responding party to identify the time period corresponding to such documents, as well as the authors and individuals who received these documents, and to provide an adequate general description of these documents by category).

I am also struck by the University's dissimilar responses to Plaintiff Simpson's and Plaintiff Gilmore's requests for production. Defendant served its Response to Simpson's First Set of Interrogatories and Requests for Production on July 10, 2003, approximately three months after the parties' Rule 16 scheduling conference and almost seven months after Plaintiff's action

was removed to federal court. Defendant's Response does not assert any general objections on grounds of privilege and does not express any intention to depart from the literal requirements of Rule 26(b)(5). It appears that Plaintiffs received their first notice of Defendant's interpretation of Rule 26(b)(5) when the University served its responses to Plaintiff Gilmore's requests for production on March 15, 2004. This was after Ms. Arguello had begun her investigation and after members of the University Police Department had joined the Attorney General's task force. The University declined to specifically identify protected, but potentially discoverable, work product documents even as one previous source of relevant information, the University Police Department, was now inaccessible to Plaintiffs' counsel. Circumstantially, this would seem to suggest a very self-serving approach to Rule 26(b)(5). Rule 26 seeks to further the interests of justice by ensuring fair discovery and minimizing surprise at trial. Had Plaintiffs presented their Rule 26(b)(5) challenge to the timely manner and cited the easily discovered case law, their arguments would have been persuasive. To their detriment, Plaintiffs sat on their hands too long.

While the court cannot endorse Defendant's failure to comply with the requirements of Rule 26(b)(5), Plaintiffs' dilatory conduct is equally problematic. Appended to Plaintiffs' reply brief are various letters between counsel during the period between March 2, 2004 and April 23, 2004 that refer to outstanding privilege issues. For example, on March 2, 2004, Simpson's counsel demanded production of documents pertaining to the Arguello investigation and a "proper privilege log." By March 15, 2004, Plaintiffs were on notice of Defendant's

interpretation of Rule 26(b)(5) and that a privilege log for the Arguello documents would not be forthcoming.  On April 1, 2004, Ms. Gilmore's counsel wrote to ask if the University had "now produced all documents responsive to our discovery requests and a privilege log concerning documents withheld."  In view of Defendant's March 15th discovery responses, the answer to that question should have been obvious.  Gilmore's counsel addressed the issue of privilege again in a letter dated April 5, 2004.  While counsel expressed concern that "CU is withholding documents other than on the basis of attorney client and/or work product privilege," he did not address the Arguello documents or challenge the University's position on Rule 26(b)(5).  Gilmore's counsel raised the issue of privilege documents in yet another letter on April 23, 2004.  In that letter, counsel challenged some of the privilege designations contained in the University's Log of Privileged Documents provided on April 6, 2004.  Gilmore demanded production of these challenged documents, threatening to "file a motion to compel" if the materials are not produced by April 30, 2004.  Again, counsel's letter was silent as to the failure to include the Arguello documents on a privilege log.

On May 21, 2004, the court held a hearing on Plaintiffs' motion to compel production of police documents.  In reviewing the hearing transcript, I found no mention of a dispute concerning the scope of Rule 26(b)(5) or Defendant's privilege log.  Also at that hearing, Plaintiffs made no reference to Ms. Arguello's investigation or the University's refusal to include those documents on a privilege log, even though a local newspaper had discussed the parameters

of Ms. Arguello's investigation in an article that appeared on April 8, 2004. Plaintiffs' failure to challenge Defendant's interpretation of Rule 26(b)(5) is particularly remarkable in light of the unequivocal decision in *Horton v. United States*, 204 F.R.D. 670 (D. Colo. 2002). I can only conclude that counsel overlooked that favorable precedent or joined in Defendant's parochial approach to Rule 26(b)(5). While Plaintiffs may now regret that oversight or ill-advised tactical decision, under the particular facts of this case, I find that any challenge to the adequacy of Defendant's privilege log or the University's failure to include Arguello investigation documents on a privilege log has been waived.

Given Plaintiffs' own inaction, I further find that waiver of privilege is not an appropriate sanction for Defendant's failure to include post-filing documents on a privilege log. *First Savings Bank, F.S.B. v. First Bank System, Inc.*, 902 F. Supp. 1356, 1361 (D. Kan. 1995) (holding that waiver does not automatically result from a party's noncompliance with Rule 26(b)(5)), *rev'd on other grounds*, 101 F.3d 645 (10th Cir. 1996). *Cf. United States v. British American Tobacco (Investments) Ltd.*, 387 F.3d 884, 891-92 (D.C. Cir. 2004) (declining to find waiver of privilege based upon defendant's failure to include challenged document on its privilege log; found that defendant had not logged this document based upon its reasonable belief that a discovery objection was applicable). To find waiver in this case, I would have to penalize one party for unjustified delay and inexcusable conduct while overlooking similar shortcomings on the part of another litigant.

D.      Documents Relating to Student-Trainer B

In addition to documents relating to sexual conduct involving Student-Trainer B and an assistant football coach, Plaintiffs have moved to compel materials concerning an incident that occurred at the Omni Hotel in November 2001 involving Student-Trainer B and football players and recruits.  Unlike the assistant football coach's conduct, the Omni Hotel incident would seem to fall within the liberal scope of Rule 26(b)(1).[13]  Plaintiffs are seeking police records and records of interviews conducted by the Office of Sexual Harassment, as well as documents prepared in the course of the Arguello investigation.

The demand for police records relating to Student-Trainer B must be denied.  Unlike the police records relating to C.C., which may have existed prior to February 2004, it appears that any University police records relating to Student-Trainer B and the Omni Hotel incident were created after February 2004 and under the auspices of the Attorney General's task force investigation.  For reasons previously stated, this court finds that these police records are not in Defendant's possession, custody or control for purposes of Rule 34.

Having made that finding, I remain troubled by apparent inconsistencies in the factual record.  In December 2004, the University advised Plaintiffs' counsel that it had

> turned over two documents to the CU Police Department for return to the
> Attorney General.  These documents include a copy of the interview conducted
> by Tim Delaria as part of the Attorney General's investigation which he in turn
> provided to the University's Sexual Harassment Office in connection with an

40

> investigation into allegations of harassment by [an assistant football coach]. The
> second document is a report regarding an allegation of sexual assault by a football
> player. I am providing you with this information because as you know we have
> previously advised you, as well as the court, that we had certain documents as to
> which the Attorney General had asserted custody and control.

*See* Exhibit 14 attached to Defendant's Response to Plaintiffs' Joint Motion. Once again, the

University's phraseology is striking. The letter concedes that the University had possession of

certain police records, but claims that the Attorney General had "custody and control."

However, Rule 34 is written in the disjunctive, and requires production where the responding

party has "possession, custody *or* control." *See Soto v. City of Concord*, 162 F.R.D. 603, 619

(N.D. Cal. 1995) (noting that only one of the enumerated requirements in Rule 34 must be met to

require production). Remarkably, Plaintiffs' counsel did not raise this issue in response to the

University's December 7, 2004 letter. The University's obtuse description makes no reference

to the Omni Hotel incident or allegations involving football recruits, stating merely that the

records in question dealt with allegations of sexual harassment by an assistant football coach and

an alleged sexual assault by an unnamed football player.

However, documents reviewed *in camera* indicate that in April 2004, the University's

Office of Sexual Harassment was interested in learning about the entirety of Student-Trainer B's

experiences in the Athletic Department, but did not want to force Student-Trainer B to re-live all

of her experiences with football players. As an alternative means of obtaining information, the

Office of Sexual Harassment asked for Student-Trainer B's consent to obtain a transcript of her

interview with Detective Delaria.  In her sealed affidavit, Student-Trainer B stated that she was

"interviewed several times by CU Detective Delaria who took notes and audio taped one of the

interviews."  *See* Exhibit A attached to Plaintiffs' Joint Motion for Sanctions.  Without access to

Officer DeLaria's records, I can only assume that the "interview conducted by Tim Delaria"

referenced in the University's December 7th letter was with Student-Trainer B.  It is also

reasonable to assume that at least some of the documents returned to the CU Police Department

in December 2004 were retrieved from the Office of Sexual Harassment.  If true, that fact was

withheld from Plaintiffs' counsel.

Disclosure of police records to the Office of Sexual Harassment in April 2004 also was

contrary to representations made to this court by then-University Chief of Police James

Fadenrecht in May 2004.  In an affidavit submitted in support of the University's Response to

Plaintiffs' Motion to Compel Production of University Police Documents, Chief Fadenrecht

emphasized that his Department had been directed by the Attorney General's task force not to

share any documents or reports concerning ". . . allegations of sexual misconduct by members of

the University football team, with any member of the public, and including University of

Colorado administrators, pending the dissolution of the Special Task Force."  *See* Attachment 1

to University's Response to Plaintiffs' Motion to Compel Production of University Police

Document.  In light of subsequent events, I am also struck by Chief Fadenrecht's statement in

May of 2004 that

> the CUPD has no reports or documents, other than documents regarding the
> events of December 7, 2001 which have been produced to Plaintiffs, concerning
> allegations of sexual assault which occurred prior to December 7, 2001 by any of
> the individuals alleged to have assaulted plaintiffs Simpson and Gilmore.

*Id.* It is clear that Detective Delaria had interviewed Student-Trainer B prior to the submission of

Chief Fadenrecht's affidavit. Given Mr. Whitney's testimony that his task force was not

investigating "allegations of sexual harassment," one might reason that Detective Delaria, a task

force member, had interviewed Student-Trainer B in connection with possible sexual assaults. If

so, it would seem rather difficult to reconcile Chief Fadenrecht's representations with Detective

Delaria's investigation and subsequent disclosures to OSH. I remain troubled by the

University's apparent lack of candor. However, it does appear that Defendant presently lacks

possession, custody or control of documents exclusively maintained by the Attorney General's

task force.

The University takes the position that "as to OSH files (or files in the Office of Judicial

Affairs), there is no file of an investigation of any allegations of sexual harassment by Trainer B

at the Omni." *See* Defendant's Response to Plaintiffs' Joint Motions, at 4. The University

further insists that

> [n]either Trainer B nor Ms. Arguello made a complaint of sexual harassment or
> sexual assault to the OSH or the OJA based on any of Trainer B's sexual contacts
> with players or the circumstances at the Omni. At no time has the University's
> OSH or OJA investigated or been asked to investigate an allegation of sexual
> harassment or sexual assault related to the event at the Omni or Trainer B's
> contacts with players. No University official was ever advised by Ms. Arguello
> that Trainer B alleged that she was sexually harassed or assaulted at the Omni.

*Id.* at 10.

The University's repeated references to "investigations" seems directed to the Rule 34 requests propounded by Plaintiff Simpson, which specifically asked for "all documents relating to any *investigation* of sexual misconduct" and "all documents relating to any *investigation* of misconduct." Defendant argues that it had no obligation to produce OSH documents because the Office of Sexual Harassment or the Office of Judicial Affairs never investigated nor were asked to investigate "an allegation of sexual harassment or sexual assault related to the event at the Omni." From the University documents provided for my *in camera* review, it appears that while the Office of Sexual Harassment had some knowledge of the incident at the Omni Hotel, no "formal investigation" of that incident was never initiated by the OSH.[14]

Defendant's failure to produce OSH documents in response to Plaintiff Gilmore's requests is harder to rationalize. Plaintiff Gilmore's Rule 34 requests were broader in scope, asking for "any and all documents, including correspondence, memoranda, . . . complaints, whether formal or informal, . . . and documents of any description which contain any information concerning claims or allegations of alcohol violations, sexual harassment, sexual abuse, sexual molestation and/or sexual assault or any other violence against women involving CU football recruits." By its very terms, this request is not limited to "investigatory" materials, but rather sought "information." Moreover, Plaintiff Gilmore's request does not exclude incidents where the alleged victim expressed an unwillingness to take further action.

Defendant was required to produce non-privileged, responsive documents in its possession, custody or control, including documents maintained by the Office of Sexual Harassment.  The University was not entitled to narrowly parse Gilmore's requests to avoid its production obligations.  *See King-Hardy v. Bloomfield Board of Education*, 2002 WL 32506294, * 4 (D. Conn. 2002) (noting that a request for production should be given a reasonable construction); *Adolph Coors Co. v. American Insurance Co.*, 164 F.R.D. 507, 518 (D. Colo. 1993) (expressing the view that in responding to Rule 34 requests, a responding party is "obligated" "to put the collective heads of its lawyers and agents together, . . . to give those requests a reasonable construction, to conduct the search for documents required by rule 34 and to produce responsive documents").  Presumably, the University decided not to produce OSH documents referring to Student-Trainer B's involvement with football players or recruits because some unidentified University official or employee made the unilateral decision that such activity did not involve sexual harassment or sexual assault[15] and because Student-Trainer B did not make a "formal" complaint.  However, the University's current Sexual Harassment Policy states that it is "the responsibility of the sexual harassment officer(s) to determine the most appropriate means for addressing the *report* or *complaint* . . . [including] . . . determining that the facts of the complaint or report, even if true, would not constitute a violation of this Policy" (emphasis added).[16]  Presumably, the Office of Sexual Harassment could receive a "report" from someone other than the alleged victim, such as Ms. Arguello or another member of the University faculty

45

or student body.  Ms. Arguello's interview with Student-Trainer B was not limited to her

interaction with an assistant football coach, but also addressed the Omni Hotel incident.  *See*

Exhibit A attached to Plaintiffs' Joint Motion for Sanctions.  I have reviewed Ms. Arguello's

unredacted Declaration and Student-Trainer's sealed Affidavit.  Suffice to say, those documents

differ in their wealth of detail relating to the Omni Hotel incident.  In her Affidavit, prepared

approximately a year after her interview with Ms. Arguello, Student-Trainer B describes

persistent requests for sexual favors and unwelcome sexual advances.  In her words, Student-

Trainer B "got scared and angry and was afraid."  Without Ms. Arguello's interview notes, it is

impossible for the court to know whether Student-Trainer B provided the same detailed

description during her conversation with Ms. Arguello in February 2004.  But the court is

convinced that in 2004 there were documents in the possession of the Office of Sexual

Harassment relating to sexual harassment (as defined by University policies) involving Student-

Trainer B and football players or recruits that were responsive to Plaintiff Gilmore's Rule 34

requests.  Those documents should have been produced to Plaintiffs, subject to the parties'

Protective Order, prior to the discovery deadline in August 2004.[17]

Finally, Plaintiffs have moved to compel documents prepared in connection with Ms.

Arguello's investigation.  Plaintiffs have presented alternative grounds to compel these

documents.  First, Simpson and Gilmore contend that the University has waived any legitimate

claim of privilege by failing to include the Arguello investigative materials on a privilege log.  This

court has rejected that challenge for the reasons previously stated.  Second, Plaintiffs argue that Ms. Arguello's documents are not covered by the work product doctrine because they were not prepared in anticipation of litigation.  Finally, Simpson and Gilmore argue that even if these documents are work product, they are properly discoverable under Fed.R.Civ.P. 26(b)(3), since Plaintiffs have a substantial need for the materials and are unable to obtain the substantial equivalent by other means without undue hardship.  *See* Fed.R.Civ.P. 26(b)(3).

By excluding "privileged" information from the broad parameters of pre-trial discovery, Rule 26 attempts to strike a balance between conflicting interests.  Privileges further the administration of justice and "should not be set aside lightly."  *See Horton v. United States*, 204 F.R.D. at 672; *McNeil-PPC, Inc. v. Procter & Gamble Co.*, 138 F.R.D. 136, 138 (D. Colo. 1991).  However, privileges also have the effect of withholding relevant information from the finder of fact, and for that reason should be narrowly construed.  *See Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 225 (D.D.C. 1995).  For the same reason, the party withholding information on the basis of privilege must make a clear showing that the asserted privilege applies and must establish all elements of the privilege.  *National Union Fire Ins. Co. of Pittsburgh v. Midland Bancor, Inc.*, 159 F.R.D. 562, 567 (D. Kan. 1994).  *See also* Fed.R.Civ.P. 26(b)(5) (the party claiming privilege must present sufficient information to permit the opposing party to assess the applicability of the privilege).

The work-product doctrine protects from discovery materials obtained or prepared in

anticipation of litigation, as well as the attorney's thought processes, opinions, conclusions and legal theories. *Religious Technology Center v. F.A.C.T.Net, Inc.*, 945 F. Supp. 1470, 1480 (D. Colo. 1996). *See also* Fed.R.Civ.P. 26(b)(3) (providing that while a party may, upon a proper showing of substantial need, obtain documents and tangible things prepared in anticipation of litigation or for trial, "the court shall protect against disclosure of the mental impression, conclusions, opinions or legal theories of an attorney or other representative of the party concerning the litigation"). The doctrine seeks to protect the adversary system and "rests on the belief that such promotion of adversary preparation ultimately furthers the truth finding process." *Khandji v. Keystone Resorts Management, Inc.*, 140 F.R.D. 697, 699 (D. Colo. 1992) (quoting *Grumman Aerospace Corp. v. Titanium Metals Corp. of America*, 91 F.R.D. 84, 99 (E.D.N.Y. 1981)).

> A "primary function" of the work product doctrine "is to prevent a current or potential adversary in litigation from gaining access to the fruits of counsel's investigative and analytical effort, and strategies for developing and presenting the client's case. Therefore, a waiver may occur when a party discloses work product in a manner that "increase[s] the likelihood that a current or potential opponent in the litigation would gain access to the documents in question."

*United States v. Bagley*, 212 F.R.D. 554, 560 (C.D. Cal. 2003) (internal citations omitted). The work-product doctrine must be applied in a common sense manner and on a case-by-case basis. *St. Paul Reinsurance Company, Ltd. v. Commercial Financial Corp.*, 197 F.R.D. 620, 630 (N.D. Iowa 2000).

A document is "prepared in anticipation of litigation" if the preparer faces an actual claim

or if the threat of litigation is substantial and imminent, or fairly foreseeable. *See Kidwiler v.*

*Progressive Paloverde Insurance Co.*, 192 F.R.D. 536, 542 (N.D. W.Va. 2000). "Factors that

courts rely on to determine the primary motivation for the creation of a document include the

retention of counsel and his involvement in the generation of the document and whether it was a

routine practice to prepare that type of document or whether the document was prepared in

response to a particular circumstance." *Electronic Data Systems Corp. v. Steingraber*, 2003 WL

21653414, *5 (E.D. Tex. 2003). *See also United States ex rel. (Redacted) v. (Redacted)*, 209

F.R.D. 475, 480 (D. Utah 2001) (holding that documents were protected by the work product

doctrine where the materials at issue were prepared at the direction and under the supervision of

attorneys investigating allegations in the pending action); *Wikel v. Wal-Mart Stores, Inc.*, 197

F.R.D. 493, 495 (N.D. Okl. 2000) (holding that the "involvement of an attorney makes it more

likely than not that the focus has shifted toward litigation, making materials more likely to have

been prepared in anticipation of litigation").

In her Redacted Declaration, Ms. Arguello states that she was hired by the University's

General Counsel, "to provide legal advice to the University and to conduct an investigation,

including interviewing University employees and others, relating to issues raised by this litigation

and related public allegations." *See* Exhibit 2 to Defendant's Response to Plaintiffs' Joint

Motion. A newspaper article appended to Plaintiffs' Joint Reply quotes a University

spokesman as stating Ms. Arguello was hired "to investigate the recent allegations and also some

larger issues of the culture and atmosphere in the athletic department." *See* Exhibit A attached to Plaintiffs' Joint Reply.  In the same article, Ms. Arguello states that she was asked to "investigate and provide advice pertaining to the current allegations," and to look at whether a culture exists within the Athletic Department that is "disrespectful, demeaning or otherwise harmful to women." *Id.*  Other documents submitted for the court's *in camera* review describe Ms. Arguello as "an outside investigator hired by the University of Colorado to investigate the culture and climate within the Athletics Department."  On another occasion, University employees were told that

> Arguello's investigation was examining and investigating the female escort issue
> and then as Arguello began obtaining more information, the investigation was
> expanded to determine what (sic.) the environment of the Athletics Department,
> so Arguello began interviewing all of the female employees in Athletics since
> 1999, when Barnett came to CU as the head football coach.

While Ms. Arguello's mandate has been described in differing terms, I conclude from any perspective that documents generated by Ms. Arguello and her investigators were prepared in anticipation of litigation and, therefore, are protected by the work product doctrine.  Based upon the totality of circumstances, this court finds that in early 2004, the threat of expanded or new litigation against the University and its Athletic Department was both real and imminent.  The original pleadings filed by Ms. Simpson and Ms. Gilmore alleged, in part, that the University of Colorado "continued to encourage, permit and foster a sexually-hostile environment," had violated NCAA rules and regulations by "permitting, fostering and remaining deliberately

indifferent to an environment in which women were subject to sexual harassment and sexual assaults by football players and recruits," and that the University "had actual knowledge of and was deliberately indifferent to known sexual harassment, sexual assaults and sexual discrimination of female students and other women." *See* Plaintiff Simpson's Complaint, at ¶¶ 16, 51 and 58; Plaintiff Gilmore's Complaint, at ¶¶ 16, 41, and 42.  In early 2004, the CU Board of Regents established an Independent Investigative Committee to consider, *inter alia*, the University's athletic policies and programs with respect to sexual conduct and alcohol use, and the implementation of those polices and programs.  It cannot be reasonably disputed that the Committee and its public hearings received extensive media coverage.  Indeed, that media coverage increased the potential for future or expanded litigation.

Moreover, within several weeks after the start of Ms. Arguello's investigation, Plaintiffs moved to amend their Complaints.  Those amended complaints added new factual allegations, including paragraphs alleging that the Athletic Department hired prostitutes to facilitate recruiting, that members of the Athletic Department were aware that a female member of the football team was repeatedly sexually harassed by teammates, and that a female employee of the Athletic Department was sexually assaulted by a football player in September 2001.  These new allegations seemingly parallel the scope of Ms. Arguello's investigative mandate.

Finally, I find nothing in the record to suggest that Ms. Arguello was hired in the ordinary course of University affairs or that her investigation was customary or routine.  Indeed, it is

notable that the subject investigation was not conducted by members of the Athletic Department or by the University's General Counsel.

I am equally unpersuaded by Plaintiffs' invocation of Rule 26(b)(3). Plaintiffs correctly note that fact work product may be discovered upon a showing of substantial need and undue hardship. However, in this case, the court finds that Simpson and Gilmore have not made the requisite showing. Plaintiffs contend, without elaboration or factual support, that Defendant has "withheld all substantial equivalents of Arguello interviews . . . causing undue hardship in obtaining the documents by other means." *See* Plaintiffs' Joint Reply, at 5. I note, however, that Plaintiffs were aware of C.C.'s identity for months before the discovery deadline, but apparently made no attempt to take her deposition. Simpson and Gilmore also were aware in May 2004 that the University had declined to produce a police report concerning C.C., but declined to pursue remedies available under the Criminal Justice Records Act. I am not convinced that these documents could not be obtained by Plaintiffs without undue hardship.

Plaintiffs may not have known Student-Trainer B's name prior to the discovery cutoff. However, they have her affidavit and tendered that exhibit to the District Court as part of Plaintiffs' Supplemental Response and Brief in Opposition to the University of Colorado's Motion for Summary Judgment. *Bartlett v. State Farm Mutual Automobile Ins.*, 206 F.R.D. 623, 628 (S.D. Ind. 2002) (holding that the requesting party's burden under Rule 26(b)(3) "is a difficult one and is satisfied only in 'rare situations, such as those involving witness

unavailability'"").  While the discovery period had closed before Plaintiffs received Student-Trainer B's affidavit, this court has the authority under Fed.R.Civ.P. 16 to amend a scheduling order upon a showing of good cause.  There certainly was the possibility of taking Student-Trainer B's deposition upon a showing of good cause and a showing that Plaintiffs were unable to present facts essential to justify their opposition to Defendant's motion for summary judgment.  *See* Fed.R.Civ.P. 56(f).  *See also EEOC v. International Profit Association, Inc.*, 206 F.R.D. 215, 220 (N.D. Ill. 2002) (finding no substantial need for interview notes obtained by EEOC where the defendant employer had names and factual summaries of potential witnesses and could depose witnesses and elicit information directly from them).  Plaintiffs did not pursue either avenue for relief.

Plaintiffs' Joint Motion to Compel also requests an award of expenses incurred by Simpson and Gilmore in pursuing relief under Rule 37(a).  Where a motion to compel is granted in part and denied in part, the court is directed to apportion the reasonable expenses incurred in relation to the motion among the parties in a just manner.  *See* Fed.R.Civ.P. 37(a)(4)(C). Given that Plaintiffs' motion was denied in substantial part, I will exercise my discretion and require each party to bear their own fees and costs associated with the Joint Motion to Compel.  *Cf. Nalco Chemical Co. v. Hydro Technologies, Inc.*, 148 F.R.D. 608, 617 (E.D. Wis. 1993) (requiring each party to bear their own costs and fees where the motion to compel was only partially successful).

Accordingly, for the reasons set forth herein, Plaintiffs' Joint Motion to Compel is GRANTED IN PART and DENIED IN PART.  In requiring the limited production of OSH documents, the court is merely enforcing Plaintiffs' right to legitimate discovery.  Plaintiffs' Motion to Alter or Amend Judgment must rise or fall on its own merits.

II.     *Plaintiffs' Joint Motion for Sanctions*

Plaintiffs have moved for sanctions under Fed.R.Civ.P. 37(b)(2) and (c)(1), based upon Defendant's perceived failure to supplement and correct its responses to Simpson's Request for Production Nos. 4 and 5, and Gilmore's Request for Production Nos. 2 and 3.  Plaintiffs contend that they were "irreparably prejudiced by having had to conduct discovery and respond to legal arguments without knowing of the incident at the Omni."  *See* Plaintiffs' Joint Motion for Sanctions, at 14.  Simpson and Gilmore propose as sanctions:  (1) an order that the "actual knowledge" element of Title IX liability be taken as established; (2) an order prohibiting Defendant from introducing any evidence or cross-examination that contradicts, rebuts or impeaches Student-Trainer B's testimony; (3) an order striking Defendant's dispositive motions and motion *in limine* precluding evidence of other incidents of sexual harassment or assault; (4) an order awarding attorneys' fees and costs incurred in connection with the Joint Motion for Sanctions and various depositions of CU employees; and (5) an order informing the jury of Defendant's concealment of relevant, discoverable information.  *Id.* at 15.

54

A party who fails to amend a prior discovery response, without substantial justification, may be sanctioned. Rule 37(c)(1) is written in mandatory terms, stating that the offending party "is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed." However, the court retains considerable discretion to impose, "in addition to or in lieu of this sanction," other appropriate sanctions including the specific sanctions authorized under Rule 37(b)(2)(A), (B), and (C), as well as an award of reasonable fees and costs. *See* Fed.R.Civ.P. 37(c)(1). *See also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (noting that the district court's discretion should be given particularly wide latitude in imposing sanctions under Rule 37). In determining an appropriate sanction under Rule 37(c) or Rule 37(b)(2), courts are directed to consider various factors. While the specific tests under Rule 37(c) and Rule 37(b)(2) vary slightly, under either standard the court should consider the degree of actual prejudice to the moving party, the culpability or bad faith of the non-moving party, and the amount of interference with the judicial process. *See, e.g., Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (identifying factors that the court should consider in determining whether a violation under Rule 37(c) was justified or harmless); *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (identifying factors that should be considered prior to choosing dismissal as a sanction under Rule 37(b)(2)). Ultimately, the court should exercise its discretion consistent with the primary goal of Rule 37, which is to deter misconduct, and should impose the least severe sanction which

appears adequate to deter and punish the wrongdoer. *Hite v. The PQ Corp.*, 1998 WL 895893,

*2 (D. Kan. 1998). *See also* Fed.R.Civ.P. 37(b)(2) (directing the court to "make such orders . . .

as are just").

After considering the appropriate factors, this court declines to impose the sanctions

proposed in Plaintiffs' Joint Motion. Based upon the record presently before the court, I am not

convinced there is a factual or legal basis for the non-monetary sanctions requested by Plaintiffs.

In referring to the incident at the Omni Hotel in November 2001, Plaintiffs contend that "rumors

began spreading immediately, and a senior staff supervising trainer approached [Student-Trainer

B]. At her end-of-semester exit interview with Head Trainer Willard in December 2001, B was

suspended from the program." *See* Plaintiffs' Joint Motion for Sanctions, at 5. Simpson and

Gilmore presume or speculate that the "rumors" related to the incident at the Omni Hotel and

that Student-Trainer B's suspension was a consequence of that incident.

Plaintiffs' allegations of an "elaborate subterfuge" are not supported by the Office of

Sexual Harassment records submitted for my *in camera* review or by the record submitted by

Simpson and Gilmore. There is no information to suggest that head football coach Gary Barnett,

Athletic Director Richard Tharp, or University Chancellor Richard Byyny had knowledge of the

Omni Hotel incident prior to December 7-8, 2001. Yet, the District Court has determined that

"[b]ecause these officials had the requisite control over the football program, their knowledge of

the alleged risk is a critical consideration in determining the University's Title IX liability." *See*

Order Granting Defendant's Motion for Summary Judgment, at 9.  Notably, Student-Trainer B's sealed affidavit offers no facts or information to suggest that she discussed the Omni Hotel incident with any University official with the requisite control over the football program prior to 2004.

I realize that Plaintiffs believe that various University officials gave false or misleading deposition testimony.  Those accusations may be based on nothing more than speculation or an incorrect assessment of circumstances.  For example, Plaintiffs insist that when Coach Barnett was deposed on April 16, 2004, "he had to have known of Student-Trainer B's reported harassment because it involved several of his current players plus an assistant coach . . . ."  *See* Plaintiffs' Joint Motion for Sanctions, at 13.  Based upon my *in camera* review of OSH documents, I found no evidence to support this assumption.  But even assuming Plaintiffs' assumption is correct as to Coach Barnett's knowledge in April 2004, there is no indication that prior to December 708, 2001, Student-Trainer B reported the Omni Hotel incident to an appropriate official for purposes of Title IX.  Plaintiffs also insist that President Hoffman concealed her knowledge of the Omni Hotel incident during her deposition on June 5, 2004.  Simpson and Gilmore draw this conclusion because Ms. Arguello had interviewed Student-Trainer B and because Ms. Arguello was a member of the University's "investigating team."  However, Ms. Arguello apparently decided that Student-Trainer B was not a victim of sexual harassment or sexual assault.  Rather than reflecting deliberate deception, as Plaintiffs suggest,

President Hoffman's deposition testimony may be based on incomplete or incorrect information. Plaintiffs have not come forward with sufficient evidence to support the drastic sanctions sought in their Joint Motion.

As a practical matter, Plaintiffs seek relief that cannot be granted at this time. In light of the District Court's decision to grant summary judgment in favor of Defendant, there are no pending dispositive motions or motions *in limine* that could be struck or denied. Similarly, any order that the "actual knowledge" element of Title IX liability be taken as established, or any order prohibiting Defendant from introducing evidence that contradicts, rebuts or impeaches Student-Trainer B's testimony, would have no force or effect in view of the fact that no trial will be held unless Plaintiffs' Motion to Alter or Amend Judgment or For Relief from Judgment, filed on April 14, 2005, is granted. I realize that Plaintiffs filed their Joint Motion for Sanctions prior the District Court's decision on summary judgment. However, this court must decide Plaintiffs' request for sanctions based upon the current posture of the litigation. It would inappropriate for me to make any assumptions as to the disposition of Plaintiffs' Motion to Alter or Amend Judgment or For Relief from Judgment.

At this time, I will deny without prejudice Plaintiffs' request for non-monetary sanctions. Plaintiffs may renew their requests for non-monetary sanctions should the District Court grant their Motion to Alter or Amend Judgment. As previously noted, the court concludes that each side should bear their own fees and costs related to Plaintiffs' Joint Motion to Compel.

As the pending Joint Motion for Sanctions is inexorably intertwined with that discovery motion,

I will deny Plaintiffs' request for monetary sanctions.

## CONCLUSION

For the foregoing reasons, the court hereby orders that:

(A)   Plaintiffs Simpson and Gilmore's Joint Motion to Compel (Document # 637), filed under
seal on March 22, 2005, is GRANTED IN PART and DENIED IN Part.  Defendant is
hereby required to produce records maintained by or in the possession, custody or
control from the University of Colorado's Office of Sexual Harassment which document
or describe sexual conduct involving Student-Trainer B and football players and/or
football recruits.  These documents will be produced to Plaintiffs within two (2) weeks of
this Order and will be subject to the terms and conditions of the Protective Order entered
by the court in this action.

(B)   Plaintiffs Simpson and Gilmore's Joint Motion for Sanctions for Defendant's
Concealment of Football Recruiting Sexual Harassment  (Document # 545), filed under
seal on March 11, 2005, is DENIED.

(C)   Defendant University's Motion to Supplement Record Regarding Plaintiffs' Joint
Motion to Compel and Joint Motion for Sanctions (Document # 717), filed on May 5,
2005, is GRANTED.

(D)   Defendant and its counsel shall within fourteen days from the date of this Memorandum
Order show cause in writing why they should not be subject to sanctions or discipline for
lack of candor towards this court with respect to representations made in support of
University's Response to Plaintiffs' Motion to Compel Production of University Police
Documents, dated May 19, 2004, and University counsel's letter to Plaintiffs counsel on
December 7, 2004.


DATED this _____ day of July, 2005.

BY THE COURT:

_____

Craig B. Shaffer
United States Magistrate Judge

1.     Rule 26(b)(5) provides that where a party withholds material or information that is otherwise discoverable on the basis of privilege or as trial preparation material, "the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."

2.     No comparable language was included in the University's responses to Plaintiff Simpson's discovery requests.

3.     It appears that President Hoffman was referring to conduct involving Student-Trainer B.

4.     Rule 56(f) provides that the trial court "may refuse the application for [summary] judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had" should it appear that the non-moving party cannot "present by affidavit facts essential to justify the party's opposition." *See* Fed.R.Civ.P. 56(f).

5.     Plaintiffs contemporaneously filed a Redacted Motion to Alter or Amend Judgment or For Relief from Judgment which was not sealed.

6.     Ms. Simpson's counsel clearly understood the distinction between players and coaches. For example, Plaintiff Simpson's Interrogatory No. 6 referred to "each member, coach, staff person, representative and volunteer working for the University of Colorado football team . . . ."

7.     Plaintiffs' motion to compel seems to premised on the assumption that "CU apparently has multiple documents regarding [the C.C.] incident, including police reports dating back to Fall 2001; *probably* counsel Christine Arguello's interview notes and reports; *probably* an Office of Sexual Harassment Police ("OSHP") investigation, and possibly other records as well." *See* Plaintiffs' Joint Motion to Compel, at 5 (emphasis added).

8.     Based upon Mr. Whitney's testimony and the court's *in camera* review of documents submitted by the University, it appears that CU police officers were active members of the Attorney General's task force by March 15, 2004.

9.     In denying without prejudice Plaintiffs' motion to compel police records, this court specifically invited Plaintiffs to renew their request for relief if further discovery established that the University had misrepresented the factual record or had "subverted intentionally and in bad

faith their obligations under Rule 34."

10.    Plaintiffs also declined to challenge my May 21, 2004 ruling as clearly erroneous or contrary to law, pursuant to Fed.R.Civ.P. 72(a).

11.    I readily concede that attorney interview notes illustrate the difficulty in distinguishing between opinion and fact work product. *See, e.g., Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) (rejecting the notion that a lawyer's interview notes are always opinion work product, and acknowledging that "under certain circumstances purely factual material embedded in attorney notes may not deserve the super-protection afforded to a lawyer's mental impressions"); *In re John Doe Corp.*, 675 F.2d 482, 493 (2d Cir. 1982) (while noting that the mental impressions and legal theories of the interviewing attorney are entitled to the greatest protection afforded by the work product doctrine, held that portions of interview notes may be discoverable to the extent the notes "recite in a paraphrased, abbreviated form, statements" made by the interviewee relating to factual events). However, the difficulty in drawing that distinction does not relieve a party of its obligations under Rule 26(b)(5).

12.    Rule 29 of the Federal Rules of Civil Procedure permits parties to modify by written stipulation the procedures governing or limitations placed upon discovery. The litigants' informal course of dealing will not, however, substitute for the requisite written stipulation. *Cf. Pescia v. Auburn Ford-Lincoln Mercury, Inc.*, 177 F.R.D. 509, 510 (M.D. Ala. 1997) (holding that as a condition of enforcement, Rule 29 requires that the parties' agreement be in writing; an oral agreement will not satisfy the stipulation requirement of Rule 29).

13.    It bears repeating that Rule 26(b)(1) addresses "relevance" only in the context of discovery. Rule 26(b)(1) permits discovery of information that would be inadmissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

14.    Webster's New Collegiate Dictionary defines "investigate" to mean "to observe or study by close examination and systematic inquiry."

15.    Given the information presented in her sealed affidavit, I am not certain that Student-Trainer B would agree with that assessment.

16.     The current University's Sexual Harassment Policy defines sexual harassment as

interaction between individuals of the same or opposite sex that is characterized by unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made

either explicitly or implicitly a term or condition of an individual's employment, living conditions and/or educational evaluation; . . . or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive working or educational environment.

17.    During the hearing on April 27, 2005, Mr. Whitney took the position that documents in the possession of the University's Office of Sexual Harassment were not within the constructive possession of the Attorney General's task force because the task force was not looking into sexual harassment as a criminal offense. *See* Transcript of April 27, 2005 Proceedings, at 76. Once again, I am struck by defense counsel's lack of candor. On November 23, 2004, University counsel wrote to Ms. Gilmore's attorney stating that Defendant had "police records on multiple incidents" of sexual harassment or sexual assault that could not be produced based upon directives from the task force. University counsel makes no mention of records maintained by the Office of Sexual Harassment.